# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| NANCY P. LYONS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action No. 7:09cv00272 |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | By:  Michael F. Urbanski |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Nancy P. Lyons ("Lyons") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for supplemental security income ("SSI") under the Social Security Act (the "Act").  Lyons argues on appeal that the ALJ erred in determining she could perform her past relevant work as a fast food service worker and that he improperly evaluated both her physical and mental impairments in coming to that conclusion.  After carefully reviewing the record, the undersigned finds that the ALJ's decision is supported by substantial evidence.  As such, the Commissioner's decision is affirmed, defendant's Motion for Summary Judgment (Dkt. #18) is **GRANTED**, and plaintiff's Motion for Summary Judgment (Dkt. # 15) is **DENIED**.[1]

## I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001).  "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached

---

[1]  A hearing on the pending motions was held in this matter on June 8, 2010.  As such, plaintiff's motion for hearing (Dkt. #17) is **DENIED as moot**.

through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work.  Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520).  If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step.  20 C.F.R. § 416.920(a)(4).  Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[2] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II

Lyons was born in 1953 and has a limited ninth grade education.  (Administrative Record, hereinafter "R." 13.)  Lyons' past relevant work experience includes working as a certified nurse assistant ("CNA") in retirement and nursing homes and as a fast food worker/cook.  (R. 13.)  Lyons filed an application for SSI benefits on May 11, 2007, alleging disability as of the same date due to carpal tunnel, chronic dizziness that causes falls and back injuries, high blood pressure, and depression.  (R. 11, 13, 135, 187.)  Lyons' application for benefits was rejected by the Commissioner initially and again upon reconsideration.  An administrative hearing was held on November 6, 2008.  (R. 23-52.)

---

[2] RFC is a measurement of the most a claimant can do despite his limitations.  See 20 C.F.R. § 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p.  RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain).  See 20 C.F.R. § 416.929(a).

In an opinion issued on December 18, 2008, the ALJ found that Lyons' bilateral carpal tunnel syndrome, dizziness, bipolar disorder, depression, and anxiety panic attacks all qualify as severe impairments, pursuant to 20 C.F.R. § 416.920(c), but held that her impairments did not meet or equal any listed impairment. (R. 17.) The ALJ determined that Lyons had the RFC to perform a range of medium work, including lifting and carrying up to 50 pounds occasionally and 25 pounds frequently, standing and/or walking up to 6 hours in an 8-hour workday, and sitting 6 hours. (R. 21.) He found she could perform frequent pushing/pulling with the upper extremities and determined she has no limitations in fine and gross manipulation or reaching and handling. (R. 21.) He specifically noted that the severity of Lyons' dizziness would not affect her ability to perform sustained work activity, but stated that she should avoid even moderate exposure to hazards. (R. 21.) With respect to her mental impairments, the ALJ determined that Lyons had moderate limitations in her ability to sustain concentration, persistence or pace, but held that her mental impairments would not interfere with her ability to carry out or understand simple instructions, respond appropriately to supervision and usual work situations, deal with changes in routine work settings, or make routine work-related decisions. (R. 21.)

The ALJ held that this RFC precludes Lyons from performing her past work as a CNA but allows her to perform her past relevant work as a fast food worker, as that job generally is performed in the national economy. (R. 21.) Accordingly, the ALJ held that Lyons failed to meet her burden of proof at step four of the sequential evaluation process and is not considered to be disabled under the Act. (R. 21-22.) The Appeals Council denied Lyons' request for review and this appeal followed. (R. 1-3.)

## III

Lyons argues on appeal that the ALJ erred in finding that she could perform her past relevant work as a fast food worker.  At the administrative hearing, Lyons testified that she last worked as a cook at a fast food restaurant for three months in 2007,[3] which required her to be on her feet "all the time" and lift boxes of frozen foods.  (R. 29.)  On her disability application, she explained that these boxes weighed 100 pounds.  (R. 160.)  She further testified at the administrative hearing that she left this job because, "my hands would go numb and I would get dizzy and to where I couldn't hardly stand up sometime."  (R. 30.)

In response to the hypothetical posed by the ALJ, which described a range of medium work, the vocational expert ("VE") concluded that Lyons could perform her past relevant work as a fast food service worker.  (R. 44.)  Although the VE testified that this job is classified as medium work (R. 43), the ALJ correctly noted in his opinion that the job is classified as light work by the Dictionary of Occupational Titles ("DOT").  (R. 20.)  While Lyons' RFC would not allow her to perform this job as she described it (i.e., requiring her to lift 100 pounds), the ALJ concluded that she could perform the job as it is generally performed in the national economy.  (R. 20.)

---

[3] Lyons also worked as a fast food worker from 1969-75, 1979-83, and 1988-91.  (R. 136.)  Because she performed these jobs over 15 years ago, they do not qualify as past relevant work under the Act.  The ALJ correctly determined, however, that Lyons' part-time job as a fast food worker in 2007 qualifies as past relevant work.

Work experience qualifies as past relevant work under 20 C.F.R. § 416.965(a) when "it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity."  See also Social Security Ruling ("SSR") 82-62.  Lyons performed this job within the last 15 years.  (R. 159.)  The vocational expert testified that this job is unskilled (R. 43), and unskilled work requires only one month or less to learn the techniques, acquire the information, and develop the facility needed for average performance.  (R. 13 (citing the Dictionary of Occupational Titles).)  Lyons worked at McDonald's for three months in 2007, long enough for her to learn the job.  (R. 29.)  Finally, this work qualifies as substantial gainful activity as defined in 20 C.F.R. § 416.972(a), even though it was only part-time, as she was paid for this work and it involved significant physical and mental activities.  (See R. 160.)

# A.

On brief, plaintiff points out the difference between the ALJ's determination that fast food worker is classified as light duty work by the DOT and the testimony of the VE, who classified the job as medium work. [4]  (Pl.'s Br. 4.)  Plaintiff notes that the ALJ specifically asked the VE to alert him when the VE's classification of any job differs from the classifications set forth in the DOT,[5] and the VE agreed to do so.  (R. 42.)  Yet the VE provided no explanation for the difference between his testimony that fast food worker is classified as medium work and the DOT's classification as light work.

But this discrepancy is immaterial.  The ALJ determined that Lyons had the RFC to perform a range of medium work.  If she can perform medium work, she can perform her past relevant work as a fast food worker, regardless of whether it is classified as medium (per the VE testimony) or light (as the ALJ found based on the DOT).

Plaintiff further argues on brief, "[s]ince the ALJ's RFC determination limited Plaintiff to light work, Plaintiff could not perform her past relevant work [as described by the VE]."  (Pl.'s Br. 4.)  This is simply not the case.  The ALJ determined Lyons had the RFC to perform a range of medium work, which included the capacity to lift/carry up to 50 pounds occasionally and 25 pounds frequently, stand and/or walk 6 hours and sit 6 hours in an 8 hour workday.  (R. 21.)  On that score, plaintiff's argument fails.

---

[4]  In finding the fast food worker job is classified as medium work, it is unclear whether the VE was testifying with respect to the job as Lyons performed it or as generally performed in the national economy.  He stated only, "And her job at McDonald's, food service worker, medium."  (R. 43.)

[5]  It is worth noting that the ALJ asked the VE in advance to identify and explain any conflicts between his testimony and the DOT, in an effort to comply with the requirements of Social Security Ruling 00-4p.  The VE did not alert the ALJ as to the discrepancy between his testimony and the DOT classification of a fast food worker.

**B.**

Plaintiff also claims that the ALJ failed to fully develop the record as regards the physical and mental demands of Lyons' past relevant work, citing Social Security Ruling ("SSR") 82-62. (Pl.'s Br. 5.) SSR 82-62 provides that "[d]etailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate" in determining whether a claimant can perform her past relevant work. The ruling further states that the claimant is "the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work." SSR 82-62.

In this case, Lyons' statements as to the demands of her past relevant work set forth on her disability application and in her testimony at the administrative hearing were sufficient for the ALJ to determine that she could perform her job as a fast food worker. Lyons stated on the Work History Report filed in conjunction with her disability application that her 2007 job at McDonald's involved the use of machines, tools and equipment such as a grill and deep fryer. (R. 160.) She reported that she worked 4 to 5 hours per day and stood that entire time, reached for 4 to 5 hours per day, and handled or grasped objects for 4 to 5 hours per day, but did not walk, sit, climb, kneel, crouch or crawl. (R. 160.) She further stated that she performed tasks such as mopping, sweeping, and carrying large boxes of frozen foods and supplies from the basement (frequently carrying 100 pounds); that the job did not require technical knowledge or skills; that she did not supervise others; and that it did not involve writing, completing reports or performing similar duties.[6] (R. 160.) At the administrative hearing, Lyons testified that she was

---

[6] Although it occurred more than fifteen years ago and does not qualify as "past relevant work," it is worth noting that Lyons provided information on a Disability Report – Adult – Form SSA-3368 as to the demands of her work as a fast food cashier from 1988-1991. (R. 136.) She stated that in this job she used machines, tools and equipment; did not use technical knowledge or skills; did not perform writing, complete reports or similar duties; and did not

a cook, she was required her to be on her feet all the time, and she lifted boxes of frozen foods. (R. 29.) She testified she had trouble performing the job because her hands would go numb and she would get dizzy. (R. 30.) The undersigned finds the ALJ fully developed the record with respect to the demands of Lyons' past relevant work. Based on Lyons' description of these demands and the ALJ's RFC determination, the ALJ concluded that she could not perform the work as she described, but could perform the job as it exists in the national economy. (R. 20.) This finding is supported by substantial evidence.

## IV

Plaintiff argues that the ALJ improperly evaluated Lyons' physical and mental impairments in determining she had the RFC to perform her past relevant work. The undersigned disagrees and find the ALJ's consideration of the evidence concerning both her physical and mental impairments to be amply supported by the record.

## A.

Lyons contends that the ALJ improperly evaluated her physical impairments. Specifically, Lyons argues that the numbness in her hands stemming from bilateral carpal tunnel syndrome and dizziness prevent her from working. The ALJ determined that both of these impairments were considered severe (R. 17), but that neither prevented her from performing her past relevant work. The ALJ found that the objective medical evidence did not support the level of severity Lyons claims with respect to her dizziness, nor did it support a conclusion that she has any more than mild limitations in using her hands. (R. 18-19.) He considered both of these impairments in determining Lyons had the RFC to perform medium work. He noted that "she

---

supervise others. (R. 136-37.) She further reported that she walked 4 hours total each day; stood 8 hours total; stooped 4 hours; handled or grasped big objects for 1 hour; lifted 50 pounds occasionally and 25 pounds frequently; and did not sit, climb, kneel, crouch, crawl, or reach. (R. 136-37.)

should avoid even moderate exposure to hazards such as working at heights and around dangerous machinery" because of her dizziness and determined that she had no limitations in fine and gross manipulation or reaching and handling, and that she could perform frequent pushing and pulling with the upper extremities. (R. 21.) These findings are supported by the record evidence.

## 1.

Lyons has been diagnosed with carpal tunnel syndrome, but the medical evidence does not support more than mild limitations in the use of her hands. Indeed, other than a carpal tunnel diagnosis, there are few objective medical findings related to the use of her hands.

On February 3, 2007, Lyons complained of tingling in her hands in the emergency room, at which she presented with a chief complaint of congestion. (R. 214-15.) She reported experiencing pain at a level 8 out of 10 and stated she had been diagnosed with carpal tunnel; however, examination was negative for Tinel's sign.[7] She was diagnosed with bronchitis and discharged. (R. 214.) Lyons presented to the emergency room two more times in April but did not mention pain or numbness in her hands at either visit. She did not complain of carpal tunnel symptoms again until a May 15, 2007 office visit with primary care physician Amy Messier, M.D., during which Lyons stated her symptoms were getting progressively worse, that she has constant numbness in both hands, and that the ends of her fingers felt tingly. (R. 216-17.) Examination was positive for Tinel's sign, 5/5 intrinsic hand strength, and no thenar[8] atrophy. (R. 217.) Dr. Messier prescribed naprosyn for pain and wrist splints, which she instructed Lyons

---

[7] Tinel's sign is defined as "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." Dorland's Illustrated Medical Dictionary 1703 (30th ed. 2003).

[8] Thenar is the mound on the palm at the base of the thumb. Dorland's Illustrated Medical Dictionary 1893 (30th ed. 2003).

wear at night.  (R. 217.)  At the Pulaski County Free Clinic two days later, Lyons again

complained of numbness and tingling in both hands.  (R. 231.)  The Free Clinic referred her to

the Neurology Clinic at the University of Virginia for evaluation of these complaints.  (R. 231.)

At an appointment with the UVA Neurology Clinic on October 25, 2007, Lyons reported

worsening pain with the use of her hands; she complained of decreased fine finger movements

and manipulation; and she stated she drops objects from time to time as a result of numbness.

(R. 282.)  Examination revealed 5/5 strength in her bilateral upper extremities, evidence of

decreased pinprick sensation over her left thumb and decreased vibratory sensation over her right

thumb.  (R. 283.)  Otherwise, her sensations were within normal limits.  (R. 283.)  She was

diagnosed with bilateral carpal tunnel syndrome, which Dr. Taylor recommended be treated

conservatively with over-the-counter drugs, Aleve and Pepcid.  (R. 284.)  Dr. Taylor noted he

hoped that this high-dose nonsteroidal anti-inflammatory regimen would improve her median

nerve inflammation.  (R. 284.)  She was instructed to use bilateral wrist splints at night.

(R. 284.)  Following this diagnosis, there is no further mention of carpal tunnel symptoms in the

medical records.

 Although Lyons has the medically determinable impairment of bilateral carpal tunnel

syndrome, the record supports the ALJ's conclusion that Lyons has no more than mild

limitations in the use of her hands.  Lyons' carpal tunnel was treated conservatively with over-

the-counter medications and wrist splints.  There is no indication that any surgical intervention is

required, and after her neurological evaluation in October, 2007, she did not complain of carpal

tunnel symptoms again.  Despite her complaints of numbness, Lyons indicated on her disability

application that she can do the laundry, dusting and some cleaning.  (R. 128.)  She grocery shops,

reads, talks on the phone, lives alone and filled out her disability forms herself.  (R. 126, 129-30,

133, 169-70.)  No doctor has opined that her carpal tunnel syndrome results in any functional limitations.  Indeed, Donald Williams, M.D., the reviewing state agency physician, determined that Lyons has no manipulative limitations.[9]  (R. 325.)

Lyons testified at the administrative hearing, "I can't pick up anything or [my hands] just go completely numb.  And if I have something in my hand I drop it."  (R. 32.)  Lyons further stated that she would be able to pick up a dime off the table but if she did it repetitively her hands would go numb.  (R. 32.)  She also reported in May, 2007 that this numbness was constant.  The objective evidence simply does not support her claims that these symptoms prevent her from working.  When faced with conflicting evidence in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work.  Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); accord Melvin v. Astrue, No. 606cv32, 2007 WL 1960600, at *1 (W.D. Va. July 5, 2007).  Accordingly, the ALJ is not required to accept Lyons' testimony that she is disabled, and instead must determine through an examination of the objective medical record whether Lyons has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged.  Craig v. Chater, 76 F.3d 585, 592-94 (4th Cir. 1996) (stating the objective medical evidence must corroborate "not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers.").  A claimant's statements alone are not enough to establish a physical or mental impairment.  20 C.F.R. § 416.928(a).  "[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which

---

[9]  Dr. Williams did find, however, that Lyons was limited in her ability to push and pull with her upper extremities as a result of her carpal tunnel syndrome, but he did not specify the extent of this limitation.  (R. 324.)  The ALJ determined that she could perform frequent pushing and pulling with her upper extremities (one-third to two-thirds of the time during the workday).  (R. 21.)  For the reasons set forth herein, the undersigned finds the ALJ's determination that she could perform frequent pushing and pulling with her upper extremities to be supported by substantial evidence.

could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." Craig, 76 F.3d at 591 (citing Mickles v. Shalala, 29 F.3d 918, 922 (4th Cir. 1994)); see also 20 C.F.R. § 416.929(b). Subjective evidence cannot take precedence over objective medical evidence or the lack thereof. Craig, 76 F.3d at 592 (quoting Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)). The ALJ must determine whether Lyons' testimony about her symptoms is credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989); Melvin, 2007 WL 1960600, at *1; SSR 95-5p.

The court finds no reason to disturb the ALJ's determination that Lyons' complaints are not fully credible and that she does not have manipulative limitations in the use of her hands that interfere with her ability to perform sustained work activity. See Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The record simply does not support the degree of limitation Lyons claims.

## 2.

Nor does the record support Lyons' claims that dizziness prevents her from working. To be sure, Lyons' complaints of dizziness are well documented in the record. She presented to the emergency room with complaints of mild to moderate dizziness on April 19, 2007. (R. 199-200.) Records reveal she was in no apparent distress, her labs were normal, and she was discharged with a diagnosis of labyrinthitis.[10] (R. 202.) She returned to the emergency room a

---

[10] Labyrinthitis is defined as inflammation of the labyrinth, which may be accompanied by hearing loss or vertigo. Dorland's Illustrated Medical Dictionary 988 (30th ed. 2003).

few days later, claiming her labyrinthitis had not improved.  (R. 209.)  She followed up with

Scott A. Kincaid, M.D., of Carilion Family Medicine, on April 27, 2007.  (R. 221.)  She was

prescribed diazepam and meclizine for dizziness.  (R. 222.)  On May 7, 2007, Dr. Messier noted

her dizziness was "much improved."  (R. 218.)  Psychiatry notes from June 19, 2007 reveal

Lyons reported only "occasional" vertigo.  (R. 257.)  She was referred to the Neurology Clinic at

the University of Virginia for evaluation of her vertiginous symptoms.  (R. 231.)

At the Neurology Clinic, Lyons stated she had had these symptoms for the past two

years.  She denied syncopal episodes, headaches, vomiting, visual changes, or sensory or motor

deficits.  (R. 282.)  She stated she received no relief from antibiotics and claimed that the

meclizine helped to a moderate extent.  Dr. Taylor recommended Lyons undergo an MRI of the

brain to rule out a central lesion and that she schedule an appointment at the Vestibular Balance

Center for further evaluation.  (R. 284.)

Contrary to the Neurology Clinic records, records from the Vestibular Balance Center in

April, 2008 note that Lyons reported having experienced vestibular symptoms for the past eight

years and claimed to have associated symptoms of nausea and vomiting.  (R. 353.)  Examination

was normal, and it was noted that her symptoms, "do not appear to be the result of vestibular

dysfunction."  (R. 353.)  On May 16, 2008, Lyons reported no change in symptoms to Dr.

Taylor.  She stated that she has constant sensations of vertigo, and she denied nausea and

vomiting.  (R. 403.)  Dr. Taylor stated that her neurological exam at the Vestibular and Balance

Center was unremarkable and there was no evidence of peripheral etiology for her symptoms.

(R. 403.)  A neurological examination performed by Dr. Taylor revealed bilateral horizontal

nystagmus as well as issues with tandem walking and evidence of a mildly wide-based casual

gait.  (R. 404.)  Dr. Taylor again recommended an MRI, since Lyons had missed her first two

scheduled appointments.  (R. 403.)  According to Dr. Taylor, the MRI completed on May 16, 2008 was unremarkable.  (R. 407)

Dr. Taylor summarized his findings with respect to his examination of Lyons in a letter to Nancy O'Neill, a nurse practitioner at the Pulaski Free Clinic.  He stated Lyons' alleged symptoms have been refractory to numerous medications, her neurological exam has been unremarkable, and the Vestibular and Balance Center evaluation ruled out the possibility of a peripheral etiology.  (R. 406.)  He noted Lyons had not complained of associated nausea or vomiting, or other focal neurologic deficits in strength, sensation, language, or vision.  (R. 406.)  Dr. Taylor stated, "Given that the patient has had an unremarkable neurologic examination and neuro-imaging as well as unresponsiveness to multiple pharmacologic agents for her vertigo, we feel that there is no neurologic etiology for her symptoms of chronic vertigo" and therefore, no further evaluation was warranted.  (R. 407-08.)  Dr. Taylor opined that her symptoms may have a psychogenic etiology and he recommended she follow up with treatment for her mental impairments.  (R. 408.)  She was discharged from the Neurology Clinic given the lack of evidence of a neurologic etiology.  (R. 408)

Lyons told Dr. Taylor at her initial evaluation in October, 2007 that her symptoms had been worsening since May, 2007.  (R. 282.)  Yet she did not complain of vertigo to any of her treating physicians (aside from Dr. Taylor) following her May, 2007 visit to the Free Clinic.  She complained of back pain during a visit to the Free Clinic in July, 2008, but did not mention vertigo.  (R. 398.)  In August, 2008, she denied back pain and again said nothing about dizziness or vertigo.  (R. 399.)  In September, 2008, she complained of leg pain but no vertiginous symptoms.  (R. 399.)

Lyons received a full neurologic and full otolaryngologic[11] evaluation at the Neurology Clinic and the Vestibular and Balance Center, and the results were unremarkable.  No doctor has opined that Lyons' dizziness results in the severe limitations she claims or that it prevents her from working.  Given this record, the undersigned finds there is substantial evidence to support the ALJ's determination that Lyons' dizziness does not interfere with her ability to perform sustained work activity.  As noted supra, a claimant's statements alone are not enough to establish a physical or mental impairment.  20 C.F.R. § 416.928(a).  Subjective complaints of pain must be supported by objective medical evidence.  See Craig, 76 F.3d at 591.

In addition to the paucity of objective medical evidence supporting her dizziness, Lyons' activities of daily living are inconsistent with her claims that she suffers from constant vertigo. She lives alone, goes for walks, watches television, prepares meals, does some housework, goes grocery shopping, takes rides in the country and reads.  (R. 126-30, 167.)  On her disability function report, she stated that she was actively looking for part-time employment.  (R. 126.) While she does not drive, it is not the result of any functional limitation.  Rather, she testified she lost her driver's license fourteen years ago as a result of convictions for driving under the influence.  (R. 40.)  The ALJ fully examined the evidence of record in concluding that Lyons' dizziness did not prevent her from performing her past relevant work.  Substantial evidence supports this determination.

**B.**

Lyons also claims the ALJ erred by improperly evaluating her mental impairments.  To support this argument, she relies on a Mental Impairment Questionnaire completed by her treating licensed professional counselor Cindy Ritchey.  (R. 409-12.)  On this form, Ritchey

---

[11] Otolaryngology refers to the head and heck, including the ears, nose and throat.  Dorland's Illustrated Medical Dictionary 1339 (30th ed. 2003).

stated that Lyons has extreme limitations in her ability to: maintain attention for a two-hour segment, complete a normal workday without interruptions from psychologically-based symptoms, accept instructions and respond appropriately to criticism from superiors, deal with normal work stress, and interact appropriately with the public. (R. 411.) She also opined that Lyons has marked limitations in a number of other areas, such as her ability to understand and remember simple instructions, maintain regular attendance, make simple work-related decisions, and respond appropriately to changes in a routine work setting. (R. 411.) With respect to the four criteria in paragraph B of the listings, Ritchey stated that Lyons had extreme limitations in maintaining social functioning; marked limitation in maintaining concentration, persistence or pace; moderate limitation in restriction of daily activities; and that she had experienced three episodes of decompensation within a twelve month period. (R. 412.) Ritchey stated that she anticipated Lyons would miss more than four days of work per month as a result of her mental impairments. (R. 412.) Given these limitations, the VE testified that Lyons would be precluded from all work. (R. 49-51.)

Substantial evidence supports the ALJ's decision to give little weight to Ritchey's assessment of Lyons' mental limitations. Ritchey is not a treating physician. Rather, she is a licensed professional counselor, and while she is considered an "other source" under 20 C.F.R. § 416.913(d) that the ALJ can consider, her opinion is not entitled to controlling weight.

Ritchey's own treatment notes do not reflect the level of impairment set forth in her mental health assessment. Lyons first presented to Ritchey in February, 2007 with complaints of feeling numb and emotionally dead. (R. 281.) Ritchey referred her to a psychiatrist. (R. 254.) Ritchey's treatment notes consistently state that Lyons' mood appeared moderately depressed, that she complained of sleep disturbance, and that she related feelings of hopelessness. Lyons

complained at various times of financial stressors, having difficulty with the anniversary of her daughter's death, and having panic attacks. In August, 2007, Lyons reported feeling less depressed and notes reveal her mood appeared brighter than before. (R. 276.) Her presenting problem was noted to be "[b]oredom and approaching anniversary date of daughter's death." (R. 276.) Ritchey suggested ways for Lyons to occupy her time, such as volunteering. (R. 276.) Ritchey's notes continued to reflect that Lyons' depression was improving a few weeks later. (R. 277.) Her thought processes and behavior were noted to be within normal limits. (R. 278.) Lyons, however, reported increased levels of anxiety and difficulty leaving her home. (R. 318.) At the next visit, her mood appeared slightly brighter, but she again reported an increase in anxiety symptoms. (R. 321.) In November, 2007 Lyons stated her depression was more manageable and her agoraphobia symptoms had not worsened. (R. 348.)

Lyons did not see Ritchey again for nearly one year. Lyons presented on September 15, 2008 complaining of increased depressive symptoms and stating she had been turned down a second time for disability and her main support, her ex-father-in-law, had propositioned her for sex in exchange for financial support. (R. 393.) Ritchey contacted Lyons' treating psychiatrist, Dr. Daum, with Lyons' requests to change her medication, but Dr. Daum noted that he could not change it without seeing her. (R. 390.) In November, 2008, Ritchey filled out the Mental Impairment Questionnaire, after seeing her once in the past year. Ritchey's treatment notes simply do not document or support the severe limitations set forth in her Mental Impairment Questionnaire.

Furthermore, records from Lyons' treating psychiatrist, Dr. Daum, fail to lend support to Ritchey's mental health assessment. Lyons presented to Dr. Daum initially on June 19, 2007 "[t]o be put on some meds." Notes state Lyons was "not exactly sure why her counselor referred

her [to Dr. Daum]."  (R. 257.)  Dr. Daum's records reflect changes he made to her prescribed medications over the course of her treatment, based on her complaints of side effects.  Otherwise, the information contained in his records remained relatively constant.  Mental examinations consistently revealed Lyons was alert and cooperative, that she had a level affect, coherent thought and speech, intact cognitive functioning, and that she was not suicidal.  Dr. Daum initially diagnosed Lyons with bipolar type two depression, generalized anxiety disorder, and nicotine dependence in June, 2007.  (R. 257.)  He noted the same diagnoses in July and August, 2007.  In October of that year, Lyons reported worsening panic attacks.  (R. 308.)  Dr. Daum added panic attacks to the list of Axis I diagnoses.  (R. 308.)  Throughout his records, Dr. Daum tagged Lyons' Global Assessment of Functioning at 55.[12]

The only exception to the uniformity of Dr. Daum's records occurs in Lyons' last visit on August 15, 2008.  This office visit is documented on two different pages in the administrative record.  The first is dated August 15, 2008 and contains mental examination results and diagnoses consistent with all of Dr. Daum's earlier records.  (R. 391.)  The second page, also dated August 15, 2008, is not entirely consistent with Dr. Daum's previous findings.  Dr. Daum's reference to Lyons' counselor "Cindy" (Ritchey) and the results of the mental status examination are consistent with his earlier records and the other medical evidence contained in the record.  (R. 392.)  The Axis I, III and IV diagnoses, however, are completely different than those documented during previous six office visits.   Axis I lists diagnoses of bipolar mixed disorder, obsessive-compulsive disorder, panic disorder, generalized anxiety disorder, provisional Attention Deficit disorder, alcohol dependence, social phobia, provisional PTSD related to ghetto

---

[12]  The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994) [hereinafter DSM-IV].  A GAF of 51-60 indicates than an individual has "[m]oderate symptoms . . . OR moderate difficulty in social, occupational or school functioning . . ."  Id. at 34.

survival.  (R. 392.)  Nothing in Dr. Daum's records explain this change.  Additionally, under

Axis III, it states, "No report of allergy, obese, chronic back pain, left wrist cyst, alcohol

withdrawal seizure history."  (R. 392.)  Lyons' other medical records (including those from Dr.

Daum) consistently document her allergy to codeine, and make no mention of obesity, chronic

back pain, left wrist cyst, or alcohol withdrawal seizure history.  (R. 361.)  Also of note is the

word "Occupational" under Axis IV; Dr. Daum's other treatment notes state "Last work was

May of 2007" in this section.  The discrepancies between page 392 of the administrative record

and the rest of Dr. Daum's records are baffling.  Regardless of whether this record contains

erroneous information or correctly documents new diagnoses, however, the findings set forth on

page 392 are not supported by the entirety of the record.

The records from two consultative psychological examiners and two reviewing state

agency physicians also fail to support the mental limitations set forth in Ritchey's questionnaire.

Pamela S. Tessnear, Ph.D., performed a consultative psychological examination of Lyons on

August 28, 2007.  With respect to her depression, Lyons stated she feels "pretty good" most of

the time and feels depressed "sometimes, not as often as I used to."  (R. 235.)  However, she

reported anxiety and fear of "getting out".  (R. 235.)  Dr. Tessnear diagnosed her with panic

disorder without agoraphobia and tagged her GAF at 62.[13]  (R. 239.)  She was noted to have

chronic anxiety but that "most of her work-related impairments are due to physical

complaints…."  (R. 240.)  Dr. Tessnear determined Lyons would have difficulty learning

detailed or complex tasks, and that panic attacks are expected to cause some absences or delays,

---

[13]  A GAF of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school
functioning ..., but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at
32.

but may not be frequent.  (R. 240.)  Dr. Tessnear further noted, "[s]he is able to accept supervision and get along with co-workers and says she enjoys working with the public.  She is able to deal reasonably well with routine work stressors."  (R. 240.)

Likewise, a consultative examination performed by Angela Berry, resident psychologist, and Christopher Carusi, Ph.D., revealed diagnoses of depressive disorder not otherwise specified and panic disorder without agoraphobia.  (R. 356.)  They also tagged Lyons' GAF at 62. (R. 356.)  The examination report stated she is "capable of understanding direction, including simple and more detailed and complex directions" and noted a possibility that her symptoms may interfere with her ability to handle normal work-related stressors and maintain adequate attendance.  (R. 357.)

Finally, state agency physicians Howard Leizer, Ph.D., and Richard J. Milan, Ph.D., found that Lyons had mild restrictions in daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (R. 343, 368.)  With respect to a mental RFC, Drs. Leizer and Milan concluded that Lyons had no marked limitations and moderate limitations in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, and the ability to complete a normal workday without interruptions from psychologically based symptoms.  (R. 330-31, 373-74.)

The undersigned finds ample evidence in this record to support the ALJ's treatment of Ritchey's Mental Impairment Questionnaire and his evaluation of Lyons' mental impairments generally.  Ritchey filled out this form two months after Lyons returned to treatment after nearly a year-long absence.  Ritchey's own treatment notes do not support the extreme and marked limitations from which she indicates Lyons suffers.  Nor do the records from Lyons' treating

psychiatrist, Dr. Daum, who consistently stated Lyons had only moderate symptoms. Additionally, there is no evidence to suggest that Lyons ever required hospitalization for her mental impairments.

The ALJ assessed Lyons' functional limitations using the four criteria in paragraph B of the listings, including activities of daily living, social functioning, concentration, persistence or pace and episodes of decompensation.  See 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1200C.  He determined that she had moderate limitations in her ability to sustain concentration, persistence or pace, but held that her mental impairments would not interfere with her ability to carry out or understand simple instructions, respond appropriately to supervision and usual work situations, deal with changes in routine work settings, or make routine work-related decisions.  (R. 21.) These findings are consistent with those of the two consulting examiners and the two reviewing state agency physicians.  The ALJ's review of Lyons' mental health concerns is detailed, thorough and plainly supported by substantial evidence.  He adequately took into account Lyons' mental impairments, and for that reason, the Commissioner's decision must be affirmed.

**V**

At the end of the day, it is not the province of the reviewing court to make a disability determination.  It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence and, in this case, substantial evidence supports the ALJ's opinion.  In affirming the final decision of the Commissioner, the court does not suggest that Lyons is totally free of all pain and subjective discomfort.  The objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment.  It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating Lyons' claim for

benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Accordingly, the Commissioner's decision is affirmed and defendant's Motion for Summary Judgment (Dkt. #18) is **GRANTED**, and plaintiff's Motion for Summary Judgment (Dkt. # 15) is **DENIED.**

The Clerk of Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered: September 29, 2010.

/s/ Michael F. Urbanski

Michael F. Urbanski
United States Magistrate Judge